**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA,

Plaintiff,

v.

THE STATE OF NEW JERSEY, *et al.*

Defendants.

No. 26-4755

*Electronically Filed*

Motion Return Date: September 8, 2026

# BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND, IN THE ALTERNATIVE, CROSS MOTION FOR SUMMARY JUDGMENT, AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Jeremy M. Feigenbaum
*Solicitor General*

Stephen Ehrlich
*Deputy Solicitor General*

Jonathan Allen
Amy Chung
Liza B. Fleming
Brett Haroldson
September R. McCarthy
Ashleigh Shelton
Eileen Siegeltuch
*Deputy Attorneys General*
On the Brief

JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY

Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, New Jersey 08625

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......... 1

BACKGROUND .......... 3

A. The Law Enforcement Officer Protection Act .......... 6

B. This Case .......... 8

LEGAL STANDARDS .......... 8

ARGUMENT .......... 9

I. Plaintiff Lacks Standing To Bring This Pre-Enforcement Challenge. .......... 9

A. The Federal Government Cannot Avoid The Pre-Enforcement Standing Framework By Claiming A "Sovereign" Injury. .......... 10

B. Plaintiff Does Not Establish That Its Agents Will Wear Masks Or Withhold Identification In Ways That Violate The Act. .......... 11

II. Plaintiff's Intergovernmental-Immunity Challenge Fails On The Merits. .......... 18

A. Plaintiff Cannot Win Its Facial Challenge Because Federal Officers Violating The Act Would Not Be Entitled To Supremacy Clause Immunity In All Circumstances. .......... 19

B. Even Were This Posture Appropriate, The Act Does Not Impermissibly Regulate The Federal Government. .......... 23

III. Plaintiff Cannot Satisfy The Other Permanent-Injunction Factors. .......... 34

A. Plaintiff Has No Irreparable Injury And Has An Adequate Remedy. .......... 35

B. The Equities Heavily Favor New Jersey And The Public. .......... 37

CONCLUSION .......... 40

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abbott v. Perez*,
585 U.S. 579 (2018) .....37

*Acierno v. New Castle County*,
40 F.3d 645 (3d Cir. 1994) .....35

*Adv. Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*,
579 F. Supp. 2d 554 (D. Del. 2008) .....40

*Amoco Prod. Co. v. Village of Gambell*,
480 U.S. 531 (1987) .....34

*Arizona v. United States*,
567 U.S. 387 (2003) .....11

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .....10, 11

*Askins v. DHS*,
899 F.3d 1035 (9th Cir. 2018) .....30

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) .....26

*Boeing Co. v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014) .....20

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
595 U.S. 267 (2022) .....37

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .....11

*Clifton v. Cox*,
549 F.2d 722 (9th Cir. 1977) .....20

*Colorado v. Symes*,
286 U.S. 510 (1932) ....................24

*Cont'l Grp., Inc. v. Amoco Chems. Corp.*,
614 F.2d 351 (3d Cir. 1980) ....................35

*CoreCivic, Inc. v. Governor of N.J.*,
145 F.4th 315 (3d Cir. 2025) ....................25, 32, 33, 34

*Cunningham v. Neagle*,
135 U.S. 1 (1890) ....................20, 22

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
108 F.4th 194 (3d Cir. 2024) ....................35, 36, 37

*Ex parte Young*,
209 U.S. 123 (1908) ....................22

*Fields v. City of Philadelphia*,
862 F.3d 353 (3d Cir. 2017) ....................30

*Fraternal Order of Police v. City of Newark*,
244 N.J. 75 (2020) ....................40

*Garcia v. San Antonio Metro. Transit Auth.*,
469 U.S. 528 (1985) ....................32

*Geo Grp. Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) ....................33

*Geo Grp., Inc. v. Inslee*,
151 F.4th 1107 (9th Cir. 2025) ....................33

*Greenberg v. Lehocky*,
81 F.4th 376 (3d. Cir. 2023) ....................13, 16

*Hall v. Virginia*,
105 S.E. 551 (Va. 1921) ....................24, 26

*Hancock v. Train*,
426 U.S. 167 (1976) ....................24, 32

*Idaho v. Horiuchi*,
253 F.3d 359 (9th Cir. 2001) ................................................................20, 21

*In re Debs*,
158 U.S. 564 (1895) .............................................................................................11

*Johnson v. Maryland*,
254 U.S. 51 (1920) ....................................................................................... passim

*Leslie Miller, Inc. v. Arkansas*,
352 U.S. 187 (1956) .............................................................................................25

*Liebhart v. SPX Corp.*,
998 F.3d 772 (7th Cir. 2021) ..............................................................................40

*Lindsey v. Whitmer*,
124 F.4th 408 (6th Cir. 2024)..............................................................................10

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .............................................................................................12

*Maryland v. King*,
567 U.S. 1301 (2012) ...........................................................................................37

*Mayo v. United States*,
319 U.S. 441 (1943) .............................................................................................34

*McCulloch v. Maryland*,
17 U.S. 316 (1819) ...............................................................................................33

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .............................................................................................36

*Murphy v. NCAA*,
584 U.S. 453 (2018) .......................................................................................10, 18

*Nat'l Shooting Sports Found. v. Att'y Gen. N.J.*,
80 F.4th 215 (3d Cir. 2023) ..................................................................11, 12, 16, 17

*Nazarene v. Dehmer*,
--- F. Supp. 3d ---, 2026 WL 1470205 (D.N.J. 2025) ..........................................16

*Ne. Penn. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*,
938 F.3d 424 (3d Cir. 2019) ....................................................................34

*New York v. Tanella*,
374 F.3d 141 (2d Cir. 2004) ....................................................20, 21, 37

*Paxton v. Dettelbach*,
105 F.4th 708 (5th Cir. 2024)...................................................................13

*Plains All Am. Pipeline L.P. v. Cook*,
866 F.3d 534 (3d Cir. 2017) ....................................................................17

*Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*,
40 F.3d 1454 (3d Cir. 1994) ....................................................................17

*Pub. Int. Legal Found. v. Sec'y of the Commonwealth*,
136 F.4th 456 (3d Cir. 2025) ....................................................................9

*Pub. Utilities Comm'n v. United States*,
355 U.S. 534 (1958) ................................................................................25

*Reifer v. Westport Ins. Corp.*,
751 F.3d 129 (3d Cir. 2014) ....................................................................37

*Sargent v. Sch. Dist. of Phila.*,
165 F.4th 727 (3d Cir. 2026) ....................................................................9

*Sherwin-Williams Co. v. County of Delaware*,
968 F.3d 264 (3d Cir. 2020) ....................................................................36

*Spiehs v. Morgan*,
--- F.4th---, 2026 WL 2091027 (10th Cir. July 21, 2026) ...................................15

*Spokeo v. Robins*,
578 U.S. 330 (2016) ..................................................................................9

*State v. Ivory*,
906 F.2d 999 (4th Cir. 1990) ....................................................................24

*Students for Life Action v. Jackley*,
746 F. Supp. 3d 668 (D.S.D. 2024)...........................................................15

*TD Bank v. Hill*,
928 F.3d 259 (3d Cir. 2019) ....................................................................36

*Texas v. DHS*,
123 F.4th 186 (5th Cir. 2024)............................................................ passim

*Texas v. Kleinert*,
855 F.3d 305 (5th Cir. 2017) ....................................................20, 21, 37

*Thompson v. Del. Dep't of Servs. for Children, Youth & their Fams.*,
44 F.4th 188 (3d Cir. 2022) ....................................................................9

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ..............................................................................22

*Trump v. New York*,
592 U.S. 125 (2020) ..............................................................................17

*United States ex rel. Drury v. Lewis*,
200 U.S. 1 (1906) ..................................................................................24

*United States v. California*,
173 F.4th 1060 (9th Cir. 2026).......................................................... passim

*United States v. California*,
819 F. Supp. 3d 1109 (C.D. Cal. 2026) ..........................................17, 39

*United States v. California*,
824 F. Supp. 3d 1079 (C.D. Cal. 2026) ..............................................11

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ....................................................25, 32, 33

*United States v. City of Boston*,
--- F. Supp. 3d ---, 2026 WL 1493706 (D. Mass. May 28, 2026).........................11

*United States v. City of Philadelphia*,
--- F. Supp. ---, 2026 WL 1906075 (E.D. Pa. 2026) ..........................17, 23, 31, 36

*United States v. Cuevas-Almonte*,
156 F.4th 319 (3d Cir. 2025) ................................................................19

*United States v. Hart*,
26 F. Cas. 193 (C.C.D. Pa. 1817) ........................................................................24

*United States v. Hawaii*,
830 F. Supp. 3d 1028 (D. Haw. 2026) ..................................................................11

*United States v. New York*,
--- F. Supp. 3d ---, 2026 WL 2225423 (N.D.N.Y. Aug. 3, 2026) .............17, 23, 31

*United States v. Rahimi*,
602 U.S. 680 (2024) ..............................................................................................19

*United States v. Virginia*,
--- F. Supp. 3d ---, 2026 WL 1909995 (E.D. Va. July 2, 2026)..........17, 23, 31, 36

*United States v. Washington*,
596 U.S. 832 (2022) ..............................................................................................18

*United States v. West Virginia*,
295 U.S. 463 (1935) ..............................................................................................11

*Urquilla-Ramos v. Trump*,
821 F. Supp. 3d 603 (S.D. W.Va. 2026) ...............................................................39

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*,
529 U.S. 765 (2000) ..............................................................................................10

*Wa. State Grange v. Wa. State Republican Party*,
552 U.S. 442 (2008) ..............................................................................................19

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (2008) ..............................................................................................34

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021) .................................................................................15, 18, 36

*Wilson v. USI Ins. Serv. LLC*,
57 F.4th 131 (3d Cir. 2023) ....................................................................................9

*Winter v. Nat. Res. Def. Counsel*,
555 U.S. 7 (2008) ..................................................................................................34

*Wyoming v. Livingston*,
443 F.3d 1211 (10th Cir. 2006) ....................20, 21, 22

*Zimmerman v. City of Austin*,
881 F.3d 378 (5th Cir. 2018) ....................13

**Statutes**

8 U.S.C. § 1357(a)(3) ....................26

28 U.S.C. § 1442(a)(1) ....................37

28 U.S.C. § 2201(a) ....................37

N.J.S.A. 2A:169-3 ....................32

N.J.S.A. 2C:20-11(e) ....................32

S3114 .................... passim

**Other Authorities**

Allie Preston, *Masked and Unidentifiable: The Risks of Federal Law Enforcement Operating Without Identification*, Ctr. for Am. Progress (Aug. 28, 2025), https://tinyurl.com/fkp2bk2r ....................4

Carrie Hoke, *Masked and Unidentifiable, How ICE Tactics Create a Public Safety Crisis for Immigrant Communities*, University of Cincinnati College of Law, The Imm. & Human Rights L. Rev. (Oct. 17, 2025), https://tinyurl.com/2p896ha....................4

*Criminal Actors Impersonate ICE Agents to Commit Violent Crime,* FBI, Office of Partner Engagement (Oct. 16, 2025), https://tinyurl.com/mptr34j ....................6

Dev P. Ranjan, *Harmonizing Federal Immunities*,
109 Va. L. Rev. 427, 463 (2023)....................20

N.J.com, *It's illegal for ICE agents to wear masks in N.J.*, Youtube.com (Mar. 25, 2026), https://tinyurl.com/y6s8sjub..............................3

N.J.com, *Masked ICE agent breaks car window during arrest in New Jersey*, Youtube.com (Mar. 27, 2026), https://tinyurl.com/mcmzjp33...........................3

Raven Santana, *Masked officers, no warrant*, NJ Spotlight News (Nov. 20, 2025), https://tinyurl.com/y45yehkd..........................................................................3

Rick Rickman, *Fake Ice Agent Caught After Robbing 2 People in New Jersey*, New Jersey 101.5 (Jan. 28, 2026), https://tinyurl.com/43vc42xm.....................6

*Why Masking & Unidentified Policing is Harmful*, Ctr. for Policing Equity (2025), https://tinyurl.com/3wxdppm ........................................................................5

**Rules**

Fed. R. Civ. P. 56(a)..........................................................................................9

N.J. R. Ct. Mun. Prac. 7:8-7(b) .......................................................................32

## INTRODUCTION

The Law Enforcement Officer Protection Act of 2026 reflects a careful compromise. Anonymous policing—where law enforcement masks or refuses to provide identification—gravely threatens public safety and law enforcement safety alike. The specter of masked officers who refuse to identify themselves makes it more difficult for residents to distinguish law-enforcement officers from imposters, leading to a dangerous "rise in impersonators committing violent crimes such as kidnapping, robbery, and sexual assault." S3114 Bill Statement. Conversely, anonymous policing puts law enforcement at risk; leery of imposters, "fearful, angry individuals" have "react[ed] violently to masked or disguised law enforcement officers." *Id.* In short, these practices undermine public accountability and "ero[de] public trust in law enforcement." *Id.* But there are times when concealing identities is appropriate for law enforcement. Tactical and undercover operations are an obvious example; an officer infiltrating a gang cannot identify himself without undermining the operation. And, mindful of officer safety, state law recognizes that anonymity may be needed elsewhere to protect law enforcement.

New Jersey sensibly balanced these interests for law enforcement operating within its borders. The Act prohibits all law-enforcement officers—federal, state, county, and local—from "wear[ing] a mask or disguise when interacting with the public while in the performance of the officer's official duties." S3114 § 3. And it requires all law-enforcement officers to "provide sufficient identification prior to detaining or arresting an individual," which can be as simple as wearing "a department-issued uniform bearing the agency insignia." *Id.* § 4. But recognizing that some circumstances require a different approach, the State included a thorough list of exceptions to its requirements,

as when an officer is "engaged in an undercover assignment" or is threatened with "retaliation resulting from the performance of the officer's official duties." *Id.* § 3.

The Federal Government now seeks to throw out this careful compromise. Rather than assessing whether New Jersey's law undermines its actions on the ground, the Federal Government preemptively sued, claiming that the statute violates the intergovernmental-immunity doctrine. Yet the Federal Government has not identified situations in which its officers have insisted on anonymity in ways that would violate the Act. Nor has the Federal Government identified particular situations in which its officers would violate the Act going forward. The Federal Government nonetheless demands pre-enforcement relief to declare the statute facially unconstitutional, meaning it could never be applied to any federal officer in any circumstance. But to prove that this law facially violates intergovernmental immunity, the Federal Government must show its officers would be entitled to Supremacy Clause immunity in *all* circumstances were the Act is enforced against them. It cannot do so. That is fatal on jurisdiction and the merits.

On jurisdiction, the Federal Government has no standing because its putative injury hinges on contingency after contingency. The Federal Government has no concrete allegations regarding precisely when its officers will wear a mask or withhold identification. So neither the State nor this Court can know if federal officers would violate the Act, which has comprehensive exceptions that may well cover federal officers' actions. The Federal Government therefore lacks pre-enforcement standing.

Similar flaws plague the merits. The statute imposes only the modest burden to not wear a mask when interacting with the public and to provide identification before an arrest. And it has various common-sense exceptions for circumstances where

officers may actually need to wear a mask or withhold identification. So it is quite likely that any federal officers violating the statute will have acted unreasonably and will therefore not be entitled to Supremacy Clause immunity, meaning that they are not now entitled to pre-enforcement facial relief. And even accepting this unusual posture, the Act still does not improperly "lay[] hold of" federal agents "in their specific attempt to obey orders," but merely imposes a "general rule of conduct" that "might affect incidentally the mode of carrying out the employment." *Johnson v. Maryland*, 254 U.S. 51, 56-57 (1920). That means the Federal Government's challenge fails on the merits too.

The Federal Government's suit runs roughshod over New Jersey's sovereign authority to ensure the safety of officers and residents alike. No doubt, there can be friction between state-law obligations and federal officers' duties. But that friction is sorted out through a fact-intensive inquiry when state law is actually applied. It is not resolved by halting every application of that state law before it can be implemented—particularly when the state law, as here, is generally applicable to all. This Court should grant the State's motion to dismiss or, alternatively, enter summary judgment for the State.

## BACKGROUND

The dangers of masked, anonymized policing are well documented, harming both law-enforcement officers and the public they are sworn to protect.[1] Members of the public, unable to discern the identities of the officers patrolling their streets,

[1] S3114 Bill Statement; *see also, e.g.*, N.J.com, *It's illegal for ICE agents to wear masks in N.J.*, Youtube.com (Mar. 25, 2026), https://tinyurl.com/y6s8sjub; N.J.com, *Masked ICE agent breaks car window during arrest in New Jersey*, Youtube.com (Mar. 27, 2026), https://tinyurl.com/mcmzjp33; Raven Santana, *Masked officers, no warrant*, NJ Spotlight News (Nov. 20, 2025), https://tinyurl.com/y45yehkd.

knocking on their doors, or arresting their neighbors, are left with fear, uncertainty, and distrust in law enforcement.[2] After all, without seeing an officer's insignia or identification, residents cannot discern whether a group is "a law enforcement operation" or "criminals" that are "disguised as generic, unspecified, 'police' to commit a crime."[3]

By consequence, some individuals may refuse officers' directives, undermining the "cooperation between law enforcement and communities that officers rely on to do their jobs."[4] Others may retreat into the safety of their homes out of fear—a predictable response to tactics that shield officers from "oversight or accountability, meaning that the public has less protection from misconduct by those officers."[5] And some still may

---

[2] *See, e.g.*, Faust Decl. ¶¶ 8-9, 12 (explaining that although she "suspect[ed] based on [her] experiences" that a "masked man in an unmarked vehicle" who refused to identify himself "was an ICE agent," she was "uncertain" about whether she "witnessed … an ICE agent or armed criminal threat to [herself] and the community"); Lyon-Stirling Decl. ¶ 8 (observer explaining that "presence of masked officers [led her] to feel less safe," and caused "fear[] that the agents could become violent").

[3] Milone Decl. ¶ 11 (describing her experience witnessing masked, unidentified persons in unmarked vehicles detaining a man and explaining that "[t]o this day, [she] is not aware whether what [she] witnessed was a law enforcement operation or whether criminals were disguised as generic, unspecified 'police' to commit a crime."); *see also* Franklin Decl. ¶¶ 23-26 (detailing recent incidents of ICE impersonators).

[4] Allie Preston, *Masked and Unidentifiable: The Risks of Federal Law Enforcement Operating Without Identification*, Ctr. for Am. Progress (Aug. 28, 2025), https://tinyurl.com/fkp2bk2r; *see* Carrie Hoke, *Masked and Unidentifiable, How ICE Tactics Create a Public Safety Crisis for Immigrant Communities*, University of Cincinnati College of Law, The Imm. & Human Rights L. Rev. (Oct. 17, 2025), https://tinyurl.com/2p896ha ("fear generated by [anonymized policing] practices ripples outward," deterring individuals from "reporting crimes, seeking legal recourse, or cooperating with law enforcement").

[5] Shuchart Decl. ¶ 40; *see also* Preston, *supra* note 4 (explaining that use of masks and lack of identification is intended to "reduce accountability to the public," "instill fear[,]

confront officers in an attempt to uncover their identities, placing everyone's safety at risk.[6] Indeed, law enforcement uniforms—visual symbols of officers' authority—were created, in part, to improve officer safety itself.[7] And the failure to wear one or otherwise announce one's identity can incentivize bystander intervention (which can lead to violent force) and increase the chance of friendly fire incidents.[8]

Criminal actors—who impersonate officers—have benefitted from this anonymized policing. In November 2025, the FBI issued a report to federal, state, and local officers warning that criminal actors were capitalizing on ICE's "enhanced public profile and media coverage" to violently "target vulnerable communities," "mak[ing] it difficult for the community to distinguish between legitimate officers conducing lawful law enforcement action and imposters engaging in criminal activity."[9] For example, an

---

and stifle dissenting voices"); Hoke, *supra* note 4 (explaining that "without visible identification, mechanisms for accountability collapse, as misconduct cannot be traced to individuals, leaving victims of abuse without remedies").

[6] *See* Franklin Decl. ¶ 26 (noting confusion from officers wearing masks or concealing their identities can "lead to dangerous confrontations"); Preston, *supra* note 4.

[7] Preston, *supra* note 4.

[8] *Why Masking & Unidentified Policing is Harmful*, Ctr. for Policing Equity (2025), https://tinyurl.com/3wxdppm ("Significant bodies of research show that the presence of masked or unidentified police undermines all trust building principles," resulting in increased fear, which, in turn, "increases violent force incidents exponentially"); *see* Fu Decl. ¶¶ 5, 7 (explaining that, while attempting to film masked, non-uniformed agents, he was shoved onto the street by an unidentified agent, which left him feeling that there is "effectively no recourse against the perpetrators").

[9] *Criminal Actors Impersonate ICE Agents to Commit Violent Crime,* FBI, Office of Partner Engagement (Oct. 17, 2025), https://tinyurl.com/mptr34j; *see also* Preston, *supra* note

individual posing as an ICE officer recently robbed two people in Newark.[10] These crimes "damage[] trust between the local community and law enforcement officers," resulting in "broader negative consequences on law enforcement agencies."[11]

### A. The Law Enforcement Officer Protection Act

To protect both officers and the public from dangerous encounters, to minimize criminal impersonation of law enforcement, and to strengthen the public's trust in law enforcement, the New Jersey Legislature enacted the Law Enforcement Officer Protection Act. The Act's safeguards apply equally to federal, state, county, and local law-enforcement officers. S3114 §§ 2, 3-4.

The Act contains two main requirements. *Id.* First, the Act provides that an officer "shall not wear a mask or disguise when interacting with the public while in the performance of the officer's official duties." *Id.* § 3.a. This requirement is subject to comprehensive exceptions covering the circumstances in which a law-enforcement officer may actually need a mask or disguise to perform their duties. An officer is exempt when he is "engaged in an undercover assignment or other tactical operation" or is "the subject of a threat of retaliation resulting from the performance of the officer's official duties." *Id.* §§ 3.b(1)-(2). She is also exempt from the masking requirement when wearing "a shield that does not conceal the officer's face to protect the officer's face from

---

4 (bad actors "have taken advantage of the widespread deployment of masked immigration officers as cover to allegedly harass civilians or commit violent crimes").

[10] Rick Rickman, *Fake Ice Agent Caught After Robbing 2 People in New Jersey, Police Say*, New Jersey 101.5 (Jan. 28, 2026), https://tinyurl.com/43vc42xm.

[11] FBI, Office of Partner Engagement, *supra* note 9; Shuchart Decl. ¶¶ 45-47.

harm"; "a medical grade mask or N95 respirator designed to prevent the transmission of disease"; "a mask for protection against exposure to smoke during a State of Emergency"; "a mask designed to protect against exposure to cold during a weather emergency"; or "a mask to protect against exposure to biological or chemical agents during an incident where these agents may be present." *Id.* §§ 3.b(3)-(7).

Second, the Act requires officers to show "sufficient identification prior to detaining or arresting an individual." *Id.* § 4.a. That is a modest requirement, which is satisfied if the officer "is dressed in a department-issued uniform bearing the agency insignia"; "demonstrates a department-issued identification card bearing the officer's photograph and identifying information"; "demonstrates a badge, tag, label, or other department-issued identification which identifies the officer by number"; or "verbally discloses, in a clear and audible manner, the officer's name and the official name of the law enforcement agency by which the officer is employed." *Id.* §§ 4.a(1)-(4). Like the Act's masking requirement, the identification requirement is also subject to a series of commonsense exceptions. The identification requirement does not prohibit "a law enforcement officer in plain clothes or operating an unmarked vehicle from intervening in urgent matters of public safety." *Id.* § 4.c. It also does not apply when "the release of sufficient identification may compromise the integrity of an authorized investigation"; "a supervisor determines stealth is necessary"; or "a law enforcement officer reasonably believes the officer's personal safety is at risk." *Id.* §§ 4.b(1)-(3).

Together, these safeguards protect the safety of both law-enforcement officers and the public at large while ensuring that officers retain significant discretion to shield their faces and identities as needed for their duties. To that end, the Act takes effect

immediately and tasks the Attorney General with issuing "guidelines or a directive necessary to effectuate [its] provisions." *Id.* §§ 5-6.

### B. This Case

Two weeks after S3114 was enacted, the Federal Government sent a letter to the New Jersey Attorney General seeking information about the Act's future enforcement.[12] Because the letter had no information indicating whether federal officers intended to mask or obscure their identities in a way that would violate the Act, the Attorney General responded but declined to opine on hypothetical enforcement actions for as-yet-unknown violations of the statute. The Federal Government replied, saying federal officers will not respect the Act, but refused to identify any actual circumstances where its officers would shield their identities outside the Act's exceptions.

The Federal Government ultimately sued. Its one-count complaint brings a pre-enforcement facial challenge to the Act, alleging that the law violates intergovernmental immunity by directly regulating the Federal Government. Compl., ECF No. 1. The Federal Government contends that the Act directly regulates its officers "by dictating permissible uniforms for federal agents," Compl. ¶ 11, injuring federal officers' safety and operational effectiveness, *id.* ¶ 41, and chilling operations and recruitment efforts, *id.* ¶ 67. This motion to dismiss and, alternatively, cross motion for summary judgment and opposition to Plaintiff's motion for summary judgment, follows.

## LEGAL STANDARDS

In reviewing a motion to dismiss, the Court must "assess whether the complaint

[12] *See* ECF No. 11-2, Lindefjeld Decl., Exs. 1-2.

and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023). The Court must "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Id.* A "complaint cannot survive unless" it recites facts sufficient to "state plausible grounds for relief." *Thompson v. Del. Dep't of Servs. for Children, Youth & their Fams.*, 44 F.4th 188, 194 (3d Cir. 2022).

Summary judgment is appropriate if movants show that "there is no genuine dispute as to any material fact and the movant[s] [are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court must view the facts in the "light most favorable to the non-moving party with all reasonable inferences drawn in that party's favor." *Sargent v. Sch. Dist. of Phila.*, 165 F.4th 727, 738 n.5 (3d Cir. 2026) (cleaned up).

## ARGUMENT

The Federal Government has brought an improper pre-enforcement facial challenge to the Act. This Court should dismiss the Complaint for lack of standing. Alternatively, this Court should dismiss it for failure to state a claim on the merits, or grant summary judgment to the State.

### I. Plaintiff Lacks Standing To Bring This Pre-Enforcement Challenge.

"Standing is a threshold jurisdictional issue." *Pub. Int. Legal Found. v. Sec'y of the Commonwealth*, 136 F.4th 456, 461 (3d Cir. 2025). A plaintiff "bears the burden of establishing" its Article III standing. *Spokeo v. Robins*, 578 U.S. 330, 338 (2016). The Federal Government cannot meet its burden here. It first claims that it has an amorphous "sovereign" injury that automatically provides standing. But the mere existence of an invalid state law does not give rise to a sovereign injury for standing. Instead, the Federal

Government must do more. And its attempts to do so here fail because it alleges no concrete plans for agents to wear masks or withhold identification in ways that are prohibited by the Act. Absent allegations about when and how federal officers may actually violate the Act, the Federal Government does not have pre-enforcement standing.

### A. The Federal Government Cannot Avoid The Pre-Enforcement Standing Framework By Claiming A "Sovereign" Injury.

The Federal Government cannot establish a "sovereign injury" for standing just by arguing that the Act "violates the Supremacy Clause." MSJ at 15-17. Of course, the Federal Government, like the States, has standing to assert an "injury to its sovereignty arising from violation of its laws" by regulated parties. *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000). But the Federal Government is not attempting to enforce its statutes against the State; indeed, its legal filings identified no federal statute that the State has violated (which is why it does not even pursue a preemption theory in this case). So the Federal Government cannot rely on its own enforcement authority to identify a sufficient "sovereign injury" here for standing purposes.

That leaves Plaintiff to assert a bare "violation" of the Supremacy Clause. MSJ at 15. But the Supremacy Clause itself is "not the source of any federal rights." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015). It "simply provides a rule of decision" for when state and federal laws conflict. *Murphy v. NCAA*, 584 U.S. 453, 477 (2018); *cf. Lindsey v. Whitmer*, 124 F.4th 408, 415 (6th Cir. 2024) (Supremacy Clause does not confer standing, but only provides a non-substantive rule of decision). So "the mere *existence*" of a disfavored state law does not create "a sovereign injury to the federal

government" that "the United States may vindicate through suit."[13] *United States v. California*, 824 F. Supp. 3d 1079, 1084 (C.D. Cal. 2026); *United States v. City of Boston*, --- F. Supp. 3d ---, 2026 WL 1493706, at *9 (D. Mass. May 28, 2026) (same); *United States v. Hawaii*, 830 F. Supp. 3d 1028, 1040 (D. Haw. 2026) (similar). In other words, the mere "difference of opinion" concerning the scope of state authority is not an Article III injury; the disagreement must have real-world consequences. *United States v. West Virginia*, 295 U.S. 463, 473 (1935).

### B. Plaintiff Does Not Establish That Its Agents Will Wear Masks Or Withhold Identification In Ways That Violate The Act.

Instead, to establish pre-enforcement standing, the Federal Government must—but cannot—fit the standard test: to "show an injury in fact caused by the defendant and redressable by a court order." *Nat'l Shooting Sports Found. v. Att'y Gen. N.J.*, 80 F.4th 215, 218 (3d Cir. 2023) ("*NSSF*"). Where, as here, a plaintiff brings a pre-enforcement challenge, the injury-in-fact inquiry collapses with ripeness, meaning there is no jurisdiction if the case "depend[s] on contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* at 219. Put another way, a "highly attenuated chain of possibilities" will not do. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). So courts must ask whether a plaintiff "(1) intend[s] to take action that is (2) arguably affected with a constitutional interest but is (3) arguably forbidden by the Law, and

[13] While the Federal Government asserts that it has "for centuries had standing to seek equitable relief in the federal courts to challenge state statutes that facially violate the Supremacy Clause," MSJ at 17, its cited cases stand only for the proposition that the Federal Government has a *cause of action* in equity, not the ability to evade Article III's independent requirements in such cases. *See Arizona v. United States*, 567 U.S. 387, 395 (2012); *In re Debs*, 158 U.S. 564, 582-83, 599 (1895); *Armstrong*, 575 U.S. at 327.

(4) the threat of enforcement against them is substantial." *NSSF*, 80 F.4th at 219.

Here, the Federal Government fails the first and third prongs of the pre-enforcement inquiry because it has not plausibly alleged that its officers "intend to take action" "forbidden by the" Act. *Id.* at 218. Plaintiff vaguely asserts that its agencies "will not comply" with the Act. Compl. ¶¶ 9, 41, 70; MSJ at 8, 14-15; Allen Decl. ¶ 20; Roddy Decl. ¶ 14. But that only begets another question: whether and under what circumstances federal officers actually intend to mask or obscure their identities in ways that violate the Act, and whether or when those circumstances will actually arise. The Federal Government does not say, which is fatal to its Article III standing.

First, Plaintiff's complaint impermissibly "rests on generalized allegations" that "say[] little about what it plans to do." *NSSF*, 80 F.4th at 219-20. "Such 'some day' intentions"—"without any description of concrete plans"—fall far short of an actual or imminent injury required for standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992). That failure is particularly egregious here, where the Act specifically has exceptions that allow law-enforcement officers to shield faces and identities to meet various safety and operational needs. *See supra* at 6-8 (discussing requirements and wide range of exceptions for law enforcement needs). It is one thing to generally say that an officer intends to mask if the law always prohibits masking. It is another to make that "generalized allegation" when that fact, alone, would not contravene the statute itself.

Second, because the Federal Government does not explain whether or when its officers will wear masks or withhold identification, it has neither alleged nor shown that its actions would violate the Act. To be sure, the Federal Government suggests that its officers will wear masks and decline to show identification without *considering* the Act's

requirements and exceptions. *See, e.g.*, Compl. ¶ 70 (alleging that "[f]ederal agencies will not comply with these … laws"); Allen Decl. ¶ 20 (asserting that "DEA does not intend to require" its agents "to comply"); Roddy Decl. ¶ 14 (asserting that FBI agents "will disregard" the law "where they deem it appropriate to do so"). But whatever its subjective interest in studying state-law requirements and exceptions, the Federal Government still must show that its officers would *in fact* wear masks and decline to show identification in situations that actually do fall outside those comprehensive exceptions. *See Paxton v. Dettelbach*, 105 F.4th 708, 712 (5th Cir. 2024) (plaintiff's intention to "manufacture a firearm suppressor" failed to establish pre-enforcement standing where the law prohibited manufacturing suppressors without complying with specific procedures); *Greenberg v. Lehocky*, 81 F.4th 376, 386 (3d. Cir. 2023) (no standing to challenge rule prohibiting harassment where "planned speech could [not] be interpreted" as falling within its scope); *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) (no standing to challenge campaign-finance statute where his stated "desire to solicit funds" from donors was not barred by the statute, which only proscribed accepting aggregate campaign contributions over certain limit). A hypothetical proves the point: an individual could not challenge the federal machinegun ban based purely on an allegation that he seeks to buy a gun and will "not comply with" federal firearms laws in making his selection. Perhaps he will ultimately decide to buy a machinegun; perhaps he would decide to buy a lawful handgun instead. One's subjective intent to actually review the law does not itself allege an actual or imminent violation—which is necessary for Article III standing.

Indeed, the Federal Government's own complaint and declarations demonstrate that it is far from showing its officers will engage in conduct outside the Act's

exceptions. As to officer safety, the Federal Government complains about the risks from doxxing, taunting, tracking, and potential threats to officers' health and personal safety. *See* Compl. ¶¶ 42-59; Phantharangsy Decl. ¶¶ 19-38; Allen Decl. ¶¶ 14-16; Hargis Decl. ¶¶ 6-15, 18; Roddy Decl. ¶¶ 8-10. Yet the Act covers those concerns. Officers may wear masks if there is "a threat of retaliation" and they may withhold identification when "the officer's personal safety is at risk." S3114 § 3.b; *id.* § 4.b. Officers can also wear masks to protect against disease transmission, smoke exposure, cold weather, or chemical agents, and they can wear a "shield that does not conceal the officer's face to protect the officer's face from harm." S3114 § 3.b. So merely incanting officer safety cannot solve the issue; the Federal Government must allege a circumstance in which its officers will mask for safety reasons that fits none of the safety-related exceptions.

As to operational effectiveness, the Federal Government falls short again. It baldly asserts that the Act will thwart activities like plainclothes surveillance and undercover operations because suspects will recognize officers and take "preemptive actions to evade apprehension and obstruct enforcement efforts," *see* Compl. ¶¶ 61-62, which may "heighten the potential for volatile and dangerous confrontations," *see* Phantharangsy Decl. ¶¶ 40-42; *see also* Allen Decl. ¶¶ 14, 17, 19-20; Hargis Decl. ¶¶ 14, 19; Roddy Decl. ¶¶ 11-14. But the Act covers those bases too. Officers can wear masks or disguises if they are "engaged in an undercover assignment or other tactical operation" and they need not identify themselves if it would "compromise the integrity of an authorized investigation" or if "stealth is necessary." S3114 § 3.b; *id.* § 4.b. The Act even makes perfectly clear that "a law enforcement officer in plain clothes or operating an unmarked vehicle" is not prohibited "from intervening in urgent matters of public safety." *Id.*

§ 4.c. Once again, merely stating its interest at a high level of generality cannot solve the problem if the Federal Government cannot allege actions that it actually intends to take for operational effectiveness that are proscribed by the state statute.

Plaintiff gets no extra mileage from claiming that the Act has a "chilling effect." Compl. ¶¶ 9, 67, 69; MSJ at 18; Phantharangsy Decl. ¶ 43; Allen Decl. ¶ 20; Hargis Decl. ¶ 18. For starters, that makes no logical sense. A chilling effect occurs when someone modifies conduct to *not* violate the law. But the Federal Government here consistently alleges an (amorphous) intent to violate the Act. *Compare, e.g.*, Compl. ¶¶ 9, 41, 70 (explaining federal agencies "will not comply" with the Act), *with*, *id.* ¶ 69 (explaining threat of enforcement of the Act "chill[s] federal enforcement"); Phantharangsy Decl. ¶ 43 (same). So, by its own admission, the Federal Government is not "chilled." *See, e.g.*, *Spiehs v. Morgan*, --- F.4th---, 2026 WL 2091027, at *3 (10th Cir. July 21, 2026) (plaintiff failed to establish standing for chilled-speech claim where he asserted that he intended to continue to engage in the conduct); *Students for Life Action v. Jackley*, 746 F. Supp. 3d 668, 686 (D.S.D. 2024) (since plaintiff did not allege "it will stop" engaging in protected activity "because of the statute," it had failed to allege its conduct was "chilled").

And regardless, the "chilling effect associated with a potentially unconstitutional law being on the books is insufficient to justify federal intervention in a pre-enforcement suit." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 50 (2021). Instead, the "Court has always required proof of a more concrete injury." *Id.* Put simply, a plaintiff "cannot manufacture standing merely by inflicting harm on [himself] based on [his] fears of hypothetical future harm that is not certainly impending." *Greenberg*, 81 F.4th at 388. A plaintiff must still explain what they would have done in the Act's absence, and why

that intended conduct is at least arguably proscribed by the Act. By stating only a vague intention to mask and withhold identification—not an intention to mask or withhold identification in any specific situations even arguably outside the Act's comprehensive exceptions—the Federal Government has fallen far short of that Article III burden.

Nor can the Federal Government solve the problem by complaining about perceived ambiguities regarding the Act's exceptions. *See* Compl. ¶¶ 4 (contending that the Act provides "no guidance" on "who determines" when its exceptions "are satisfied"), 37-38; MSJ at 15; Allen Decl. ¶ 18. Initially, the Act is clear with respect to exceptions for officer identification. S3114 § 4.b. They apply if "*a supervisor* determines stealth is necessary," or when a "*law enforcement officer*" "reasonably believes" his "personal safety is at risk." *Id.* And in any event, all regulated parties must make judgment calls concerning their compliance with any law; that is why pre-enforcement standing only requires Plaintiff to establish its officers' planned conduct is "arguably forbidden." *NSSF*, 80 F.4th at 219. But mere uncertainty is insufficient for a cognizable injury. *See Nazarene v. Dehmer*, --- F. Supp. 3d ---, 2026 WL 1470205, at *11 (D.N.J. May 26, 2026) ("Although Plaintiff may reasonably prefer greater clarity in the line between [permitted and proscribed conduct], Article III requires more than uncertainty to support a pre-enforcement challenge."). As the Third Circuit explained, even when faced with an allegedly murky law, a plaintiff still must "give [the Court] something to go on" by explaining beyond "generalized allegations" how their conduct would "inevitably trigger th[e] [l]aw." *NSSF*, 80 F.4th at 220-21. Merely gesturing to the "specter of sweeping liability" without establishing a "threat of specific future harm" is insufficient to warrant the Court's intervention. *Id.* at 220 (cleaned up). But that is exactly the tactic Plaintiff tries

here: it never explains how its officers' intent to simply wear masks or obscure their identities "will inevitably trigger the [Act]." *See id.* at 220-21; Compl. ¶ 4; MSJ at 15.

"At the end of the day, the standing and ripeness inquiries both lead to the conclusion that judicial resolution of this dispute is premature." *Trump v. New York*, 592 U.S. 125, 134 (2020). So if the Court adjudicates this facial pre-enforcement claim in this posture, its order would amount to "an advisory opinion based upon a hypothetical set of facts."[14] *See Presbytery of N.J. v. Florio*, 40 F.3d 1454, 1468 (3d Cir. 1994); *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 542-43 (3d Cir. 2017) (facial constitutional challenges to law unripe when "further factual development would significantly advance [the court's] ability to deal with the legal issues presented"). No doubt, the Federal Government stands opposed to the Act. But "those seeking to challenge the constitutionality of state laws are not always able to pick and choose the timing and preferred forum for their arguments." *Whole Woman's Health*, 595 U.S. at 49-50. After all, there has never been "an unqualified right to pre-enforcement review of constitutional claims in federal

[14] Although the Federal Government says other courts found pre-enforcement standing in similar cases, MSJ at 17, those laws were broader or contained narrower exemptions or no exemptions. *United States v. California*, 819 F. Supp. 3d 1109, 1117-18, 1121 (C.D. Cal. 2026) (requiring agencies to implement written policies imposing masking and identification requirements with civil and criminal penalties); *United States v. City of Philadelphia*, --- F. Supp. ---, 2026 WL 1906075, at *2, 5-6 (E.D. Pa. 2026) (requiring agencies to implement written policies imposing masking and identification requirements on officers, and otherwise narrow exemptions for masking and no exemptions for identification, with criminal and civil penalties); *United States v. Virginia*, --- F. Supp. 3d ---, 2026 WL 1909995, at *1-2 (E.D. Va. 2026) (narrow exemptions applicable to federal officers, and imposing misdemeanor penalties); *United States v. New York*, --- F. Supp. 3d ---, 2026 WL 2225423, at *2 (N.D.N.Y. 2026) (narrow exemptions and imposing misdemeanor penalties, including incarceration). So the allegations from the Federal Government in this case would more arguably violate those laws than they do the particular Act here.

court." *Id.* The Court should dismiss the case for lack of jurisdiction.

## II. Plaintiff's Intergovernmental-Immunity Challenge Fails On The Merits.

The Federal Government's claim in this case is extraordinary. Most Supremacy Clause claims turn on the preemptive effect of particular federal laws: "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy*, 584 U.S. at 477. But the Federal Government does not contend that any federal law or regulation (or even policy) speaks to whether federal agents wear masks or provide identification while conducting law-enforcement operations, such that it could preempt state law. Instead, the Federal Government argues that the Constitution itself imposes some freestanding right that bars application of a generally applicable masking and identification law to its officers. But intergovernmental immunity only "prohibit[s] state laws that either regulate the United States directly or discriminate against the Federal Government or those with whom it deals." *United States v. Washington*, 596 U.S. 832, 838 (2022) (cleaned up). It cannot meet the demanding intergovernmental immunity test here.

Indeed, its theory suffers multiple flaws. Plaintiff wisely does not raise discrimination against the Federal Government, since the Act applies to federal, state, and local officers alike. The Federal Government argues only that the Act directly regulates federal officials and therefore violates intergovernmental immunity on its face. But its theory doubly fails. First, Plaintiff cannot meet its burden in this facial pre-enforcement posture, where it must establish that its officers would be entitled to Supremacy Clause immunity in every application of the Act. Second, the Act does not directly regulate the

Federal Government; at most, it incidentally and thus permissibly affects the officers. For either or both reasons, the Federal Government's sole claim fails on the merits.

### A. Plaintiff Cannot Win Its Facial Challenge Because Federal Officers Violating The Act Would Not Be Entitled To Supremacy Clause Immunity In All Circumstances.

Because the Federal Government brings a facial challenge, its intergovernmental-immunity claim cannot succeed. "The Supreme Court has repeatedly emphasized that facial challenges are disfavored," particularly where, as here, they "require speculation on hypothetical applications." *United States v. Cuevas-Almonte*, 156 F.4th 319, 328-29 (3d Cir. 2025). Such challenges "run contrary to the fundamental principle of judicial restraint." *Id.* And they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wa. State Grange v. Wa. State Republican Party*, 552 U.S. 442, 451 (2008). So they are "the most difficult challenge[s] to mount successfully." *United States v. Rahimi*, 602 U.S. 680, 693 (2024). It requires the challenger to establish "that no set of circumstances exists under which the statute would be valid, *i.e.*, that the statute is unconstitutional in all of its applications." *Cuevas-Almonte*, 156 F.4th at 328 (cleaned up).

Here, that means the Federal Government must show that its officers would get Supremacy Clause immunity in *all* circumstances if New Jersey sought to enforce the Act against them. To be sure, Plaintiff frames its lone claim as asserting intergovernmental immunity. But the direct-regulation variant of intergovernmental immunity and Supremacy Clause immunity are two sides of the same coin. *See Johnson*, 254 U.S. at 55 (treating intergovernmental immunity and Supremacy Clause immunity as coextensive). That makes sense because both play the same role: to determine whether federal

officials are subject to state law in the performance of their duties. *See id.*; *compare Cunningham v. Neagle*, 135 U.S. 1, 75 (1890) (Supremacy Clause immunity implicated where a federal official is "held in the state court to answer for an act which he was authorized to do by" federal law), *with Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014) (intergovernmental immunity implicated where State "regulate[d] the Department of Energy's cleanup activities directly"). So to prevail on its facial intergovernmental-immunity claim, the Federal Government must show that its officers would *always* get Supremacy Clause immunity in Act-related enforcement proceedings.

Because this is "a seldom-litigated corner of … constitutional law," there is no single test for Supremacy Clause immunity. *Wyoming v. Livingston*, 443 F.3d 1211, 1213 (10th Cir. 2006). All courts at least examine whether, "in the course of performing an act which he is authorized to do under federal law, the agent had an objectively reasonable and well-founded basis to believe that his actions were necessary to fulfill his duties." *Id.* at 1222; *Idaho v. Horiuchi*, 253 F.3d 359, 366 (9th Cir. 2001). Some courts also require that the particular federal officer subjectively believed their actions were necessary. *See, e.g.*, *Texas v. Kleinert*, 855 F.3d 305, 314 (5th Cir. 2017); *New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004); *Clifton v. Cox*, 549 F.2d 722, 728 (9th Cir. 1977). And still other tests have been updated to capture modern Supremacy Clause precedents. *See* Dev P. Ranjan, *Harmonizing Federal Immunities*, 109 Va. L. Rev. 427, 463 (2023) (explaining that the proper test is whether "adhering to the state's criminal law in the particular case at issue [would] actually prevent the federal officer from performing their official duties"). Regardless, all tests require courts to "walk the fine line created between the goal of protecting federal officers acting in the scope of their duties and the obligation

to avoid granting a license to federal officials to flout state laws with impunity." *Tanella*, 374 F.3d at 146.

Whatever the standard, one thing is clear: Supremacy Clause immunity's "delicate balancing act" is a fact-intensive inquiry. *Id.* By necessity, it requires courts to examine the circumstances of a federal officer's actions, including what they knew, when they knew it, and how they were trying to accomplish their federal duties. Unsurprisingly, then, Supremacy Clause immunity cases scrutinize detailed factual circumstances, like whether an FBI sniper reasonably believed (among other things) there was an imminent risk to an FBI helicopter when he fired his gun, *Horiuchi*, 253 F.3d at 368-69; whether a member of a federal task force reasonably believed (among other things) that he must use a "hammer-fist strike" on a fleeing suspect while holding a gun, *Kleinert*, 855 F.3d at 319; or whether a federal agent reasonably believed that he was on public land while tracking wolves based on (among other things) signage, structures, and GPS coordinates, *Livingston*, 443 F.3d at 1229.

So too here. Whether the Supremacy Clause shields federal agents from the Act will be a fact-intensive inquiry in any hypothetical enforcement proceeding. And it is difficult to imagine that federal agents would ever get Supremacy Clause immunity in those proceedings, let alone that—as the Federal Government must show for this facial pre-enforcement challenge—they would *always* get immunity. That is because the Act has broad exceptions covering every imaginable circumstance in which an officer may need a mask to perform their duties, including cold weather, undercover or tactical operations, disease prevention, or where there is "a threat of retaliation." S3114 § 3.b. The same is true for withholding identification. That minimal standard is met even when an

officer wears "a department-issued uniform bearing the agency insignia" or "verbally discloses" the "officer's name" and agency. *Id.* § 4.a. And it contains a series of broad exceptions for stealth operations and "personal safety." *Id.* § 4.b. So if a federal agent insists on masking or declining to identify themselves and does *not* fall into one of the broad exceptions, it is highly likely that they did not have "an objectively reasonable and well-founded basis to believe that [their] actions were necessary to fulfill [their] duties." *Livingston*, 443 F.3d at 1222. That means this facial challenge should fail.

Despite the Federal Government's unsupported protestations, MSJ at 24, any contrary holding would give the Federal Government a constitutional windfall and incentivize pre-enforcement facial litigation that our law disfavors. After all, if Plaintiff prevails here, it will mean that the Supremacy Clause requires a sweeping injunction barring all applications of the Act, even though the same Supremacy Clause would not provide immunity in many circumstances if New Jersey actually enforced the Act. That not only defies logic but also runs counter to foundational principles of equity.

Parties may sue in equity for an antisuit injunction "which restrains the state officer from taking any steps towards the enforcement of an unconstitutional enactment." *Ex parte Young*, 209 U.S. 123, 159 (1908); *see Trump v. CASA, Inc.*, 606 U.S. 831, 846 n.9 (2025). The whole point of antisuit injunctions is that a party who would assert unconstitutionality as a defense in any enforcement proceeding can instead bring an equitable action to stop unconstitutional enforcement on the front end. *See id.* Similar principles apply in this context. *See Neagle*, 135 U.S. at 75 (allowing Supremacy Clause immunity to be raised in an affirmative habeas suit rather than as a defense to state prosecution). But the Federal Government now flips that rationale on its head, asking for relief in its

pre-enforcement suit —no enforcement of the Act in *any* circumstances—that its officials could never get if they asserted Supremacy Clause immunity as a defense.[15]

This Court should reject Plaintiff's attempt to invert the Supremacy Clause test through anticipatory facial suits. For Supremacy Clause immunity to free a federal officer from such liability, he must (1) wear a mask or withhold identification (2) in a way that does not fall within the Act's comprehensive exceptions, causing (3) a state enforcement action against him where (4) the court finds that his illegal actions were reasonably necessary to fulfill his federal duties. So the Court should dismiss this case and hold that federal officers can raise Supremacy Clause immunity based on their individual circumstances if the Act is in fact ever enforced against them.

### B. Even Were This Posture Appropriate, The Act Does Not Impermissibly Regulate The Federal Government.

Even through a purely pre-enforcement lens, Plaintiff's intergovernmental-immunity claim fails on its own terms. "Of course an employee of the United States does not secure a general immunity from state law while acting in the course of his employment." *Johnson*, 254 U.S. at 56. So intergovernmental immunity does not "bar[] all state regulation which may touch the activities of the Federal Government." *Hancock v. Train*,

---

[15] The Federal Government cites nonauthoritative decisions addressing distinguishable statutes to argue it can "clearly bring facial challenges" to the laws. MSJ at 24. But those cases failed to address Supremacy Clause immunity as a defense, much less grapple with the proper limits of equitable relief. *United States v. California*, 173 F.4th 1060, 1068 (9th Cir. 2026); *City of Philadelphia*, 2026 WL 1906075, at *8; *Virginia*, 2026 WL 1909995, at *9. And the one recent district court decision that addressed Supremacy Clause immunity allowed a facial challenge only there were no "questions about how [the law] would apply" to federal officers and the State had conceded that "whether federal officials may be immune from liability" in a future proceeding is "[ir]relevant to the United States' facial challenge." *See New York*, 2026 WL 2225423, at *15.

426 U.S. 167, 180 (1976). Instead, immunity turns on whether the state law improperly "lay[s] hold of" federal agents "in their specific attempt to obey orders," or if it permissibly sets a "general rule of conduct" that "might affect incidentally the mode of carrying out the employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets." *Johnson*, 254 U.S. at 56-57; *Texas v. DHS*, 123 F.4th 186, 206 (5th Cir. 2024) (finding a state duty permissible where it did "impose a burden on [federal] agents" but merely an "incidental one").

Courts therefore have held for more than two centuries that generally applicable state laws may apply to federal officials. As early as 1817, for example, Justice Washington made clear that a federal mail carrier could lawfully be subjected to state and local laws prohibiting breaches of the peace. *United States v. Hart*. 26 F. Cas. 193, 194 (C.C.D. Pa. 1817). Since then, courts have consistently subjected federal employees to generally applicable state laws that incidentally affect federal operations. That includes state criminal laws. *See, e.g.*, *United States ex rel. Drury v. Lewis*, 200 U.S. 1, 7-8 (1906) (applying state criminal law to U.S. Army officers for homicide committed while on duty); *Colorado v. Symes*, 286 U.S. 510, 518 (1932) (no immunity when federal agent committed a murder during federal investigation). It also includes state traffic laws. *See, e.g.*, *Hall v. Virginia*, 105 S.E. 551, 554 (Va. 1921) (applying state traffic laws to federal postal worker that did not "in any way interfere with the performance of the Federal duties of the accused"); *State v. Ivory*, 906 F.2d 999, 1001-02 (4th Cir. 1990) (U.S. Marine not immune for fatal traffic accident when he had "not alleged anything in the conduct of his federal responsibilities which justified his violation of these laws"). And it includes state laws regulating federal facilities. *See, e.g.*, *United States v. California*, 921 F.3d 865, 884-85 (9th

Cir. 2019) (*California I*) (no immunity for federal detention facilities from state health-and-safety regulations, including state inspections). In short, "[i]t is well settled that generally applicable state laws can apply to federal agents." *Texas*, 123 F.4th at 206.

In stark contrast, state laws that seek to actually "control federal functions" are impermissible. *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 327 (3d Cir. 2025); *accord Johnson*, 254 U.S. at 56-57; *Texas*, 123 F.4th at 206. So States cannot "prevent[] the federal government from choosing how and through whom it will carry out a core federal function." *CoreCivic*, 145 F.4th at 325. They cannot require "state approval before charging the federal government" certain reduced rates. *Id.* at 326; *see Pub. Utilities Comm'n v. United States*, 355 U.S. 534, 544 (1958). And States cannot "bar federal contractors from working within the state unless they meet certain qualifications" beyond the qualifications that the Federal Government itself deemed sufficient. *CoreCivic*, 145 F.4th at 326; *see Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 188-90 (1956).

The Fifth Circuit's recent *Texas* decision is illustrative. In that case, Texas filed a state-law trespass suit to enjoin Border Patrol agents from cutting wire fencing at the Texas-Mexico border. The Federal Government argued application of state law to bind federal agents' conduct contravened intergovernmental immunity. *Texas*, 123 F.4th at 205. But the Fifth Circuit found that intergovernmental immunity did not apply because application of trespass law did not "seek to control how Border Patrol agents carry out their duties." *Id.* at 207. The court reasoned that the only federal duty implicated was one that allowed border patrol to access private lands within 25 miles of the border "for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." *Id.* (quoting 8 U.S.C. § 1357(a)(3)). And agents were not cutting the fencing in

furtherance of that specific federal duty. *Id.* So Texas's action only "incidentally impact[ed]" how Border Patrol carried out its duties because the suit "would only ensure that agents' destruction of the fencing [was] actually in furtherance of" that federal statutory duty. *Id.* The court concluded that while the injunction "impose[d] a burden on agents," it was "an incidental one that comes nowhere near the burdens courts have, in the past, found sufficient to trigger intergovernmental immunity." *Id.*

So too here. The Act does not control federal functions; it instead falls squarely on the incidental-effects side of the line. New Jersey law does not seek to control how federal officers carry out their duties by generally prohibiting masks and requiring identification. To the contrary, the Act has comprehensive exceptions for all instances in which federal agents may have a law-enforcement purpose to mask or withhold their identification. The effects of the Act are therefore minimal and analogous to those of enforcing any other generally applicable rule against federal officers, such as speed limits. *See Johnson*, 254 U.S. at 56-57; *Hall*, 105 S.E. at 554. If a Postal Service employee can be required to follow general laws prohibiting breaching the peace, and a federal officer can be required to follow a speed limit even while on the job, a federal agent can be subject to a generally applicable prohibition on masking and withholding identification in situations outside the comprehensive list of exceptions.

That "30,000-foot view of the issue … ends up a good proxy for the more granular one." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 189 (2023). The Act generally prohibits an officer from wearing "a mask or disguise," but only "when interacting with the public while in the performance of the officer's official duties." S3114 § 3.a. And it includes various exceptions for masking, including cold weather, tactical operations, disease

prevention, or where there is "a threat of retaliation." *Id.* § 3.b. The Act's prohibition on withholding identification is also catered to real-word circumstances. That minimal prohibition is satisfied if an officer wears "a department-issued uniform bearing the agency insignia" or "verbally discloses" the "officer's name" and agency. *Id.* § 4.a. In other words, the law merely requires that non-uniformed law-enforcement officers display (or verbally give) some form of identification—consistent with how federal officers have long operated—so that the public can distinguish between real officers and imposters. *See, e.g.*, Compl. ¶ 60 ("[federal] officers almost always wear tags identifying them as federal officers"); Shuchart Decl. ¶ 27; Schrader Decl. ¶¶ 6, 53-57, 60. It also has broad exceptions for both stealth operations and "personal safety." S3114 § 4.b.

So it is difficult to see how the Act "recklessly disregards officer safety and federal operational needs." Compl. ¶ 41. Unsurprisingly, the Federal Government identifies no instance when using a mask or withholding identification would be necessary to fulfill federal officers' duties but would be prohibited by the Act. For example, the Federal Government states conclusorily that the Act "[r]emov[es] the *flexibility*" of officers to wear masks or protect their identities. Compl. ¶ 66 (emphasis added); *see also* MSJ at 28-29; Allen Decl. ¶ 19; Hargis Decl. ¶¶ 17, 20; Roddy Decl. ¶ 13. But the Federal Government has not explained when its officers would require flexibility to perform their federal duties in a way that is not already accounted for by the Act's exemptions. Perhaps that is because, until 2025, federal officers enforced immigration and criminal law consistent with the Act. *See* Shuchart Decl. ¶ 27 (prior to 2025, shielding identity was an "extremely uncommon practice[]" for civil immigration enforcement agencies); Schrader ¶¶ 6, 53-57, 60 ("masking and hiding the personal identities of law-

enforcement officers as routine practice is inconsistent with the traditions of policing in the United States"). If wearing a mask or concealing identity were as vital to its operations as the Federal Government now claims, it would not leave such decisions to individual officers' discretion. Shuchart Decl. ¶¶ 44-45, 48-49. Indeed, despite listing federal statutes and regulations concerning officer uniforms and identification, *see* Compl. ¶¶ 24, 65; MSJ at 4-5, the Federal Government cites none that explicitly requires officers to mask or conceal their identities, *see* Shuchart Decl. ¶¶ 12-13. That is telling.

The Federal Government's claims regarding the purported harms from the Act merely prove that the law does not in fact control federal officers in the performance of their actual duties. Plaintiff alleges that unmasking federal officers and requiring any identification risks "harassment, tracking," "assaults," and direct threats, particularly during "high-risk enforcement operations." Compl. ¶¶ 43-60; MSJ at 11, 26; Phantharangsy Decl. ¶¶ 19-42; Allen Decl. ¶ 15; Hargis Decl. ¶¶ 6-11; Roddy Decl. ¶¶ 9-10. The Federal Government also contends these risks are increasing due to new technology. Hargis Decl. ¶¶ 7, 15. But the Act accounts for these risks by expressly allowing facial coverings if the officer is "the subject of a threat of retaliation" or engaged in "tactical operation[s], including violent-crime or organized-crime suppression." S3114 §§ 3.b(1)-(2). It also exempts the officer from providing identification if he "reasonably believes [his] personal safety is at risk." *Id.* § 4.b(3). And to the extent revealing an agent's name or badge number may result in doxxing, *see, e.g.*, Compl. ¶¶ 8, 60; Phantharangsy Decl. ¶ 40, federal agencies can use anonymized badge numbers, where the agent's information is not revealed to the public but only maintained by the agency, Shuchart Decl. ¶ 39. That is all expressly contemplated by the Act. *See* S3114 § 4.a(3).

Nor does anything in the Act undermine officers' ability to conduct "undercover operations and plainclothes missions," Compl. ¶¶ 61-62; Phantharangsy Decl. ¶¶ 40-42; Hargis Decl. ¶ 19, or the surveillance efforts that attend undercover work, Allen Decl. ¶ 17; Roddy Decl. ¶ 12. Once again, New Jersey anticipated those needs: the Act permits officers to mask when engaged in undercover assignments, S3114 § 3.b(1), and to obscure identities where providing identification may "compromise" an investigation or "stealth" is "necessary," *id.* § 4.b(1)-(2). Plaintiff thus fails to explain why the comprehensive statutory protections are insufficient to prevent suspects from "evad[ing] apprehension" or "obstruct[ing] enforcement efforts," Compl. ¶¶ 61-62, especially since they are largely consistent with documented federal policies for undercover or plainclothes operations, *see* Shuchart Decl. ¶¶ 12, 14-16, 19; Schrader Decl. ¶ 56. Over and over, it becomes clear that the Act does not actually control the performance of these federal duties, but is a mere general law that only incidentally affects their work.

Nor will removing masks or providing identification facilitate the work of "agitators" who the Federal Government says may obstruct operations. Compl. ¶¶ 47, 59-60; MSJ at 9-10; Phantharangsy Decl. ¶ 23. The Act does not require law-enforcement agencies to use marked vehicles or alert the public to their operations. And federal regulations already require immigration officers effectuating an arrest to identify themselves as soon as practicable. 8 C.F.R. § 287.8(c)(2)(iii); *see* Compl. ¶ 65. That longstanding requirement is tough to square with the Federal Government's theory that officer identification will truly interfere with "operational effectiveness." Compl. ¶¶ 62-63, 65.

The Federal Government gets no further asserting members of the public will protest immigration operations, or film and photograph officers discharging their

duties. Compl. ¶¶ 8, 43; MSJ at 9; Phantharangsy Decl. ¶¶ 20, 23, 30. That has long existed for all law enforcement. *See* Shuchart Decl. ¶¶ 35, 50 (explaining how being photographed and posted online is not a novel threat for law enforcement sufficient to justify masking or withholding identity). Regardless, the "First Amendment protects the public's right of access to information about their officials' public activities," and "recording police activity in public falls squarely within the First Amendment right of access to information." *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017); *Askins v. DHS*, 899 F.3d 1035, 1044 (9th Cir. 2018). And in any event, Plaintiff never explains how masking and withholding identification makes agents any less susceptible to protests or "agitators"—who can likely target enforcement actions by the presence of masked officers themselves—or why the exemptions for threats of retaliation or safety are insufficient to protect officers' identifiers. S3114 §§ 3.b(2), 4.b(3).

The Federal Government relies heavily on the Ninth Circuit's contrary decision to argue that the Act automatically violates intergovernmental immunity—regardless of the ways in which it accommodates all relevant law enforcement interests—simply because it regulates "government *qua* government." MSJ at 21-25 (citing *United States v. California*, 173 F.4th 1060 (9th Cir. 2026) (*California II*)). The Ninth Circuit proclaimed that while a state statute that "regulate[s] conduct that any ordinary citizen could perform" may be permissibly applied to a federal officer, a state law that applies to "conduct reserved to sovereigns" is *per se* direct regulation of the Federal Government and thus invalid, even if it only incidentally affects the federal conduct. *Id.* at 1068; *see also New York*, 2026 WL 2225423, at *11 (similar); *Virginia*, 2026 WL 1909995, at *10-11 (similar); *City of Philadelphia*, 2026 WL 1906075, at *9-10 (similar).

But that approach, which some district courts have admittedly adopted, is contrary to first principles and precedent alike. As to first principles, it is unclear why a statute would more or less "directly" regulate the Federal Government based on who *else* it covers—that is, whether it also applies to all residents or generally applies to all similarly situated state and local officers. Instead, that type of who-else-is-regulated inquiry is the province of intergovernmental immunity's *discrimination* prong, an argument the Federal Government does not raise here. *See Johnson*, 254 U.S. at 56-57 (noting that "even the most unquestionable and most universally applicable of state laws" cannot "control the conduct" of federal agents "acting under and in pursuance of the laws of the United States"). Unsurprisingly, then, the Ninth Circuit's conflation of the two intergovernmental-immunity standards finds no basis in precedent, and none of the prior intergovernmental immunity cases adopt its sovereign/non-sovereign dividing line. The Ninth Circuit itself cited only *Johnson* for its novel intergovernmental-immunity theory, but *Johnson* makes no distinction between laws that apply to "ordinary" or "sovereign" conduct. *California*, 173 F.4th at 1068. For good reason. The driver's license requirement deemed unconstitutional in *Johnson* also would have applied to any "ordinary" Maryland driver. And nobody thinks driving is conduct "reserved to sovereigns." So *Johnson* cannot justify *California*'s departure from first principles or precedent either.[16]

Nor is the Ninth Circuit's test administrable; it is impossible to draw a coherent

---

[16] While the Federal Government attempts to analogize the Act to Maryland's unconstitutional driver's license law because they both apply to federal "officers in the performance of their duties," MSJ at 24-25, any intergovernmental-immunity inquiry (including *Johnson* itself) involves a claim that the federal officer is acting in his official capacity. So the mere "performance of [federal] duties" also cannot be the dividing line between permissible and impermissible state regulation.

line between what counts as "sovereign" conduct of the government alone and "ordinary" conduct of private actors. *See Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 531 (1985) (explaining any "attempt" to tie state authority to "traditional government function" is "unworkable"). The Federal Government regularly contracts with private parties for self-evidently "sovereign" functions, including law-enforcement operations. *See, e.g.*, *CoreCivic*, 145 F.4th at 319 (contracting with private company to operate federal immigration detention centers); *California I*, 921 F.3d at 886 n.10 (same). Private security guards likewise may have power to detain, or to possess firearms in a range of situations where ordinary citizens could not, even where those actions might otherwise appear sovereign. And even ordinary citizens are sometimes authorized to perform law-enforcement functions. *See, e.g.*, N.J.S.A. 2A:169-3 (citizen's arrest provision); N.J.S.A. 2C:20-11(e) (merchant-shoplifter provision); N.J.S.A. 2A:161-1 (private execution of arrest warrant); N.J. R. Ct. 7:8-7(b) (court-approved private prosecutors). On the flip side, the Federal Government regularly engages in conduct seemingly associated with "ordinary" private citizens. *See, e.g., Hancock*, 426 U.S. at 172-73 (state permitting scheme regulating emissions from both federal and private facilities); *Johnson*, 254 U.S. at 55 (federal workers driving on local roads). The Ninth Circuit and the district courts that have adopted its rationale addressed none of this.

Instead, regardless of whether the underlying federal action applies to sovereign or ordinary acts, the inquiry remains the same: intergovernmental immunity only supersedes the state laws that "directly restrict[] federal power or substantially interfere[] with federal operations," *CoreCivic*, 145 F.4th at 322. Just like Supremacy Clause immunity, then, that inquiry necessarily involves an assessment of the "manner" and "degree" of

the law's impacts on federal functions.[17] *Id.* at 327, 329. "Intergovernmental immunity is not a formalist doctrine," so courts must always look "behind labels to substance" and gauge the actual "sting" or "effects" of the state law on federal functions. *Id.* at 322. And that makes sense. Intergovernmental immunity, from the start, was intended to protect the Federal Government only from a state law that "controls," "burdens," or "interferes" with its functions. *See, e.g.*, *McCulloch v. Maryland*, 17 U.S. 316, 426 (1819). And as explained above, the Act's limited and generally applicable masking and identification obligations and exceptions do not control or interfere with those functions.[18] So under the "functional approach that intergovernmental immunity demands," *CoreCivic*, 145 F.4th at 325, the Act prescribes "general rule[s] of conduct" that merely "affect incidentally the mode of carrying out [federal] employment," *Johnson*, 254 U.S. at

[17] The *Geo Group* cases the Federal Government cites suggest nothing different. *See* MSJ at 26. Just because a contactor's "protection from state law under the Supremacy Clause is substantially narrower than that of a federal employee" does not mean laws applicable to federal employees violate intergovernmental immunity without a consideration of the laws' effects whatsoever. *Compare Geo Grp. Inc. v. Newsom*, 50 F.4th 745, 755 (9th Cir. 2022) *and Geo Grp., Inc. v. Inslee*, 151 F.4th 1107, 1116-17 (9th Cir. 2025), *with CoreCivic*, 145 F.4th at 323, 325-28 (looking to "effects" of state law regulating private contractors on the Federal Government's operations), *and Texas*, 123 F.4th at 206-07 (looking to the "burden" that the state law imposed on Border Patrol agents' duties and concluding that the effects were too "incidental … to trigger intergovernmental immunity").

[18] The Ninth Circuit's point that even "de minimis" impacts on federal functions constitute direct regulation is incorrect for the same reasons. *California II*, at 1067. As the Federal Government recognizes, MSJ at 22, the Ninth Circuit appeared to draw this language from a case involving the separate *discrimination* prong of intergovernmental immunity. *See California I*, 921 F.3d at 883. And were it true that even de minimis burden from a nondiscriminatory law goes too far, it would no longer be the case that "generally applicable state laws can apply to federal agents," *Texas*, 123 F.4th at 206, and Supremacy Clause immunity itself would be a dead letter. *See supra* at 19-26.

56. In that sense, the Act is similar to local traffic laws that do indeed regulate how a federal officer may operate a vehicle but are nonetheless enforceable against him, immunities notwithstanding. *See id.* This law violates the doctrine of intergovernmental immunity no more than those do. If the Federal Government wants broader protection, then it is the job of Congress—not this Court—to provide it. *See Mayo v. United States*, 319 U.S. 441, 446 (1943).

## III. Plaintiff Cannot Satisfy The Other Permanent-Injunction Factors.

If this Court does not dismiss the case, it should grant summary judgment on the additional basis that an injunction is unavailable here. A permanent injunction "does not follow" as "a matter of course." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). That is, courts are "not mechanically obligated to grant an injunction for every violation of law." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). Instead, Plaintiff also has to show that (1) it has suffered irreparable injury for which there is no adequate remedy at law and (2) the balance of hardships and public interest tip in its favor. *See Ne. Penn. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 442 (3d Cir. 2019); *see Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987) (noting "the standard for a preliminary injunction is essentially the same as for a permanent injunction"). But an injunction "is an extraordinary and drastic remedy," so "the movant bears the burden of making *a clear showing*" on each factor. *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202 (3d Cir. 2024) ("*DSSA*").

All factors weigh heavily against a permanent injunction here. Plaintiff suffers no irreparable harm without an injunction and has an adequate remedy at law, in large part because it can defend against any enforcement proceedings on an as-applied basis. And

the balance of the equities and public interest weigh against an injunction.

**A. Plaintiff Has No Irreparable Injury And Has An Adequate Remedy.**

The Federal Government has not established any imminent harm here. And even if it did, that harm is far from irreparable because the Federal Government has an adequate remedy at law. To start, Plaintiff has not established that it will be harmed at all. The Federal Government claims that the Act impermissibly regulates officers' ability to wear masks and obscure their identities for safety and operational purposes, interfering with the performance of their federal duties. *See* Compl. ¶¶ 41, 66; MSJ at 27-29. But the Act explicitly permits law enforcement to shield their faces and identities in these situations. S3114 §§ 3-4; *see supra* at 6-8. Plaintiff cannot identify a single situation where federal officers would need to shield their faces or identities but are barred by the Act. *See supra* at 14-16. So any Act-related "harm" is purely speculative. *Acierno v. New Castle County*, 40 F.3d 645, 655 (3d Cir. 1994) ("[A]n injunction may not be used simply to eliminate a possibility of a remote future injury."). And "injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties." *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980).

Even if there were imminent harm, it is certainly not irreparable. Initially, the Federal Government claims it suffers irreparable harm because "unconstitutional regulation of the Federal Government is itself" irreparable, another proposition borrowed from the Ninth Circuit. *See* MSJ at 27; *California II*, 173 F.4th at 1069; *see also City of Philadelphia*, 2026 WL 1906075, at *12; *Virginia*, 2026 WL 1909995, at *14. But the Ninth's Circuit's analysis was predicated on the assumption that all constitutional injuries are *inherently* irreparable, which the Third Circuit has steadfastly rejected. *Compare*

*California II*, 173 F.4th at 1069, *with DSSA*, 108 F.4th at 203-04.

In any event, there is an adequate remedy at law: a Supremacy Clause defense in any enforcement action. *TD Bank v. Hill*, 928 F.3d 259, 278, 282 (3d Cir. 2019) (irreparable harm and inadequate remedy are "two sides of the same inquiry," and "the inability to show irreparable harm—or, relatedly, that a legal remedy would be inadequate—defeats a request for injunctive relief"); *Whole Woman's Health*, 595 U.S. at 49-50 (constitutional claims are "typically" asserted "as defenses to state-law claims"). Of course, where the defense would not ensure full relief—such as when "enforcement actions are imminent," "repetitive penalties attach to continuing or repeated violations," and the putative defendant "lacks the realistic option" of breaking the law and "raising its federal defenses," *Morales v. TWA, Inc.*, 504 U.S. 374, 381 (1992)—it may be inadequate. But here, the Federal Government has "offered no evidence that without a [permanent] injunction" courts "will be unable to decide the case or give [it] meaningful relief" for theoretical Supremacy Clause injuries. *DSSA*, 108 F.4th at 205. To the contrary, if federal officers are ever pursued, they can raise their Supremacy Clause arguments "as affirmative defenses" in any proceeding. *Sherwin-Williams Co. v. County of Delaware*, 968 F.3d 264, 270 (3d Cir. 2020). And given federal-officer removal, they would likely be able to press those defenses in this Court, meaning there is no risk they would lose their access to this forum either. 28 U.S.C. § 1442(a)(1); *Kleinert*, 855 F.3d at 313-14 (sustaining Supremacy Clause immunity after removal); *Tanella*, 374 F.3d at 148 (same).

Because immunity is a fact-bound inquiry, *see supra* 21-22, any future enforcement proceedings—not this pre-enforcement facial challenge—are the proper place to resolve whether and when federal officers must comply with the Act. Any broad facial

injunction would be both premature and contrary to principles of equity.[19]

### B. The Equities Heavily Favor New Jersey And The Public.

The balance of the equities and public interest also weigh heavily against an injunction. *See DSSA*, 108 F.4th at 205 (these factors "merge when the [State] is the opposing party"). As the Third Circuit has cautioned, courts "rightly hesitate" when asked to "enjoin enforcement" of a "democratically enacted state law" and "err on the side of respecting state sovereignty." *Id.* at 205-06. That is because a State "clearly has a legitimate interest in the continued enforceability of its own statutes." *Cameron v. EMW Women's Surgical Ctr.*, 595 U.S. 267, 277 (2022). So it is irreparably harmed if prevented from "enforc[ing] its duly enacted plans." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (same).

But New Jersey's interest in the Act goes far beyond a generalized sovereign interest in preserving duly enacted laws. By enabling the public to identify officers during routine, non-emergency law-enforcement interactions, the Act deters misconduct, facilitates non-violent civilian interactions, and mitigates the risk of impersonation by malicious actors. These concerns are not theoretical. For example, one senior citizen describes his fear that an unidentified "paramilitary group" was "kidnapping people."[20]

---

[19] Plaintiff cannot get declaratory relief for similar reasons. *See* Compl. at 22; MSJ 12. Declaratory relief is discretionary. *See* 28 U.S.C. § 2201(a) (a court "may declare" rights under the DJA). And a court should not issue such relief if other remedies are "availab[le]." *Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 146 (3d Cir. 2014). That is true here: a Supremacy Clause defense is available and easily pursued if the Act is enforced.

[20] *See also, e.g.*, Faust Decl. ¶ 12 (observer "left uncertain" whether she saw an "ICE agent or an armed criminal threat to [herself] and the community"); Milone Decl. ¶ 11.

*See* Neiss Decl. ¶¶ 2, 9. Another described persistent "nightmares" over a year after an incident where six masked agents accosted her at her home, and one agent assaulted her with his body shield, causing her to "nearly f[a]ll to the ground." Inez Jannotti Decl. ¶¶ 2-10; *see* Joshua Janotti Decl. ¶¶ 3-14. A witness describes how masked agents "disappeared" a man before his wife and two small children could say goodbye. Plumbo Decl. ¶ 8; *see also* Gomez Decl. ¶¶ 2-11. A school superintendent describes the harm for her students when masked federal agents sent children fleeing at a school bus stop. *See* O'Neil Decl. ¶¶ 2, 4-25. A 70-year-old woman witnessed scores of masked men raid a workplace, explaining how she "felt that [she] was living in a police state with armed masked men shouting orders at bystanders in [a] small warehouse area in a quiet suburban neighborhood."[21] Whitt Decl. ¶ 9. A pastor described how masked, armed agents' standoff at a home "shook the neighborhood," impacted children's school attendance, and "changed the overall feeling of safety" in town. Kaper-Dale Decl. ¶¶ 2-11.

The Act serves as an important bulwark against such interactions by promoting transparency in civilian encounters with law enforcement. Such transparency in policing "signals integrity and respect for the community's right to understand government actions occurring within their own neighborhoods," and "serve[s] as [a] critical check[] on law enforcement behavior, helping to prevent corruption and fostering ethical conduct." Franklin Decl. ¶¶ 13, 29; *see also id.* ¶¶ 11-12, 36; Shuchart Decl. ¶¶ 38, 40; Schrader Decl. ¶¶ 19, 46, 48, 65; Schlegel Decl. ¶¶ 8-9. That is why longstanding

[21] *See also, e.g.*, Brown Decl. ¶ 8 (longtime New Jerseyan expressing "disbelief" that masked enforcement actions "could occur in [his community]"); Prendergast Decl.¶¶ 2-8 (church worker explaining impact of anonymized enforcement on parishioners).

traditions of American policing encourage accountability through visible identification. Schrader Decl. ¶¶ 17-48, 60. And those traditions have constitutional foundations. The ability to identify law-enforcement officers both helps the public distinguish between legitimate seizures and outright kidnappings and ensures that individuals are afforded due process in subsequent proceedings. *Cf. Urquilla-Ramos v. Trump*, 821 F. Supp. 3d 603 (S.D. W.Va. 2026). That facilitates the public's First Amendment right to gather information concerning matters of public interest. *Cf. California*, 819 F. Supp. 3d at 1128.

The Act also benefits law-enforcement officers by allowing them to achieve their operational objectives safely and securely without unwarranted interference. Given the "rise in impersonators committing violent crimes," some "fearful, angry individuals" have "react[ed] violently to masked or disguised law enforcement officers." S3114 Bill Statement; *see also* Shuchart Decl. ¶ 40 ("Officers in intimidating, non-uniform masks, without visible identification, are at greater risk of a hostile encounter with the public."); Franklin Decl. ¶¶ 26, 36 (officer identification "increases the level of public cooperation" and mitigates "confusion [that] can lead to dangerous confrontations"). The Act's masking and identification requirements therefore ensure that the public can assess the identity of officers—encouraging de-escalation, non-interference, and improved public attitudes toward law enforcement—while permitting officers to shield their faces and identities in appropriate circumstances. *See supra* at 6-8.

Plaintiff's theoretical legal "injuries" pale in comparison. Again, the Act (through its comprehensive exceptions) covers every circumstance in which an officer may need to shield their face or identity to perform their duties. *See supra* at 6-8. So Plaintiff is seeking an injunction for its officers to wear masks and withhold identification without

necessity, in circumstances where they would not get immunity. *See supra* at 19-23. Plaintiff's parade of horribles concerning "a patchwork of local laws" does not tip the balance in its favor either. MSJ at 27, 30. Even if the State's municipalities had power to act in this sphere, "municipal action cannot run contrary to [the Act]." *Fraternal Order of Police v. City of Newark*, 236 A.3d 965, 975 (N.J. 2020). And, in any event, a feature of dual-sovereignty is a "patchwork" of state laws—whether it be differing traffic laws or criminal provisions—that are also applicable to federal officers.

There are, in short, substantial real-world consequences if the Court enjoins the Act. And the Federal Government has no legitimate countervailing interest. In such circumstances, courts decline to grant injunctive relief. *See, e.g.*, *Liebhart v. SPX Corp.*, 998 F.3d 772, 779 (7th Cir. 2021) (explaining that "a finding of liability on a defendant's part does not automatically give rise to an entitlement to [permanent] injunctive relief"); *Adv. Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 579 F. Supp. 2d 554, 558-62 (D. Del. 2008) (similar). This Court should decline to enter a permanent injunction.

**CONCLUSION**

The Court should grant the State's motion to dismiss or, in the alternative, grant the State's cross motion for summary judgment.

Dated: August 24, 2026

Respectfully submitted,

JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY

By: */s/ September R. McCarthy*
September R. McCarthy
Deputy Attorney General
September.McCarthy@njoag.gov